**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALEX OREA, individually and on behalf of** all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **OPERA EVENT, INC., a Delaware corporation; COMMUNITY FIRST GAMES, a business entity, form unknown; BRANDON BYRNE, an individual; ANDREW RINGLEIN, an individual; ERIK BRYANT, an individual; EDDIE TSAIO, an individual; and MATT ESPINOZA, an individual,** <br><br> Defendants. | Case No.: 1:26-CV-03194 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT                                           2

II. PARTIES                                                        6

III. JURISDICTION AND VENUE                                        9

IV. FACTUAL ALLEGATIONS                                            13

V. CLASS ALLEGATIONS                                              32

CLAIMS FOR RELIEF                                                 35

PRAYER FOR RELIEF                                                 41

JURY DEMAND                                                       42

## I. PRELIMINARY STATEMENT

1. This case exposes a carefully orchestrated scheme to defraud retail investors through the sale of digital assets tied to a purportedly revolutionary blockchain technology platform called Communi3. Defendants conceived, marketed, and sold a series of non-fungible tokens and promised a forthcoming cryptocurrency token, $SCI, using the trappings of a legitimate technology enterprise to conceal what was, from its inception, a mechanism for extracting capital from the investing public. The $SCI token was never launched. The exchange listing never materialized. The investors were left holding worthless digital assets while Defendants pocketed millions of dollars.[1]

2. The scheme followed a now-familiar playbook. First, Defendants fabricated a misleading innovation narrative, holding out the Communi3 platform as a thriving B2B SaaS enterprise with blue-chip clients including The Sandbox, Yield Guild Games, and Magic Eden. These claims were designed to create the illusion of a legitimate, revenue-generating business that could support the valuation of a digital asset ecosystem. Second, Defendants borrowed credibility from recognized industry names, invoking meetings with Animoca Brands and Binance, referencing prior venture capital raises, and showcasing purchases by purported institutional investors to manufacture the appearance of sophisticated validation. Third, Defendants structured a staking mechanism and tokenomic system that functioned as an inducement to purchase and a barrier to selling, artificially constraining supply to support prices while the ecosystem depended entirely on continuous inflows of new capital from new participants.

---

[1] Unless otherwise indicated, the allegations in this Complaint are based on Plaintiff's personal knowledge as to Plaintiff's own acts and experiences and, as to all other matters, on information and belief. Plaintiff's information and belief is based on the investigation of counsel, including review and analysis of publicly available information (including Defendants' statements, websites, written materials, interviews, social media communications, and Discord server logs), press reporting, and, where relevant, on-chain blockchain records and transaction data, as well as other information obtained through counsel's investigation.

3. Defendant Opera Event, Inc., doing business as Communi3, is a Delaware corporation originally headquartered in the San Francisco Bay Area. Its co-founders, Defendants Brandon Byrne and Andrew Ringlein, orchestrated an elaborate scheme to sell digital assets to retail investors by leveraging the appearance of a legitimate software business. As part of that scheme, Defendants deliberately used the principal legitimacy-conferring venues of the non-fungible-token industry to manufacture credibility and induce purchases and continued holding by participants across the market, including purchasers outside New York. Foremost among these was NFT NYC, the flagship annual NFT and Web3 conference held in New York City. In June 2022, Defendants traveled to New York to attend and promote at NFT NYC, hosted an exclusive in-person event for existing and prospective investors, and used the conference as one of the central stages on which they reinforced the same misrepresentations and omissions regarding the Communi3 platform, the $SCI token, and the projected economic value of the digital assets that Defendants were simultaneously disseminating through Discord, Twitter, Medium, and other public channels.

4. Between approximately March 2022 and late 2023, Defendants sold multiple collections of NFTs on the Solana blockchain, including Communi3: Laboratories (priced at approximately $100,000 each), Communi3: Mad Scientists (5,001 NFTs at 2 SOL each), Adorable Assistants, and Rifters: Exiles (7,037 NFTs at 10 SOL each). In total, Defendants raised conservatively $6.5 million to $8 million or more in direct NFT mint proceeds alone, plus additional revenue from secondary market royalties and platform fees.

5.  The centerpiece of Defendants' marketing was the promise of the $SCI token. Defendants told Mad Scientist NFT holders that ten percent of the total $SCI token supply would be airdropped to them. They provided specific valuation projections, comparing $SCI to comparable token offerings and projecting a fully diluted market capitalization of $250 million to $500 million, with individual token prices of $0.25 to $0.50. Defendants told holders that an upgraded Mad Scientist NFT would be generating $30 to $60 per day based on these projections. These were not aspirational goals shared in passing. They were specific, quantified representations made repeatedly over the course of more than a year to induce purchases and discourage selling.

6.  Defendants reinforced these representations with a drumbeat of deadline promises that were serially broken. The $SCI token was variously promised for Q3 2022, December 2022, January 2023, and Q1 2023. At each juncture, Defendants provided seemingly credible reasons for the delay while simultaneously reassuring holders that the launch was imminent and that the value of their holdings would be vindicated. This pattern of rolling deadlines served a critical function in the scheme: it prevented holders from selling into the secondary market, thereby maintaining the illusion of asset value and price stability while Defendants continued to extract capital from new entrants.

7.  The structure of Defendants' enterprise bore the hallmarks of a Ponzi-like scheme. The entire ecosystem depended on continuous inflows of new capital. Early purchasers were sustained by the entry of later purchasers. The staking mechanism locked existing holders' assets while new collections extracted fresh capital. The promises of the $SCI token served as the carrot that kept capital trapped in the system. And the insiders, Defendants themselves, were positioned to extract value at each stage through mint

5

proceeds, royalties, and platform fees, while retail participants bore the entire risk of an inherently unsustainable model.

8. While making these promises, Defendants maintained undisclosed control over the supply and liquidity conditions of the digital assets. They controlled the timing and quantity of new NFT releases. They set royalty rates on secondary market transactions. They determined the staking parameters that dictated how many NFTs would be locked at any given time. And upon information and belief, Defendants and their insiders retained significant undisclosed positions in the digital assets, positioning themselves to benefit from the artificially inflated prices their representations created.

9. By early 2023, the project was effectively dead. Platform activity ceased. Discord communications slowed to a trickle and then stopped entirely. The $SCI token was never launched. The promised exchange listing never occurred. No airdrop was ever distributed. Defendants simply walked away, completing the final stage of their scheme: a liquidity extraction, colloquially known as a "rug pull," in which insiders monetize their positions by selling into or abandoning an artificially created market, leaving retail investors holding worthless assets. The collapse was not a market event. It was the inevitable culmination of a scheme that was designed from the outset to transfer wealth from retail investors to Defendants.

10. Plaintiff brings this action individually and on behalf of a class of all persons who purchased Communi3, Rifters, or related digital assets and suffered losses as a result of Defendants' unlawful conduct. Plaintiff asserts claims for violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"), California's False

Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"), and for unjust enrichment.

## II. PARTIES

### a. Plaintiff

11. Plaintiff Alex Orea is a citizen and resident of the State of California. In October 2022, Plaintiff purchased Rifters NFTs and related digital assets in reliance on Defendants' integrated representations concerning the Communi3 and Rifters ecosystem, including the forthcoming $SCI token, the interoperable faction-token mechanics linking the Rifters and Communi3 collections, and the projected economic value of the digital assets. Plaintiff relied on Defendants' specific representations regarding the timing of the token launch, the projected token valuations, and the utility of the NFTs in making his purchasing decisions. Plaintiff would not have purchased these digital assets, or would have paid substantially less for them, had he known the truth about Defendants' ability and intention to deliver on their promises. As a direct and proximate result of Defendants' conduct, Plaintiff suffered thousands of dollars in monetary damages.

### b. Entity Defendants

12. Defendant Opera Event, Inc. ("Opera Event" or the "Company") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the San Francisco Bay Area, California. Opera Event does business as "Communi3" and is the parent entity responsible for the development, marketing, and sale of the Communi3 platform and all associated digital assets, including the Mad Scientists, Laboratories, Adorable Assistants, and related NFT collections. Opera Event

7

raised at least $5 million in Series A venture capital funding in April 2020 from investors including Antera, Atlas Ventures, Everblue, and Konvoy Ventures. Opera Event directed its deceptive conduct at consumers nationwide, including California consumers, through internet-based marketing conducted from its California headquarters. Opera Event directed, controlled, and profited from the unlawful conduct alleged herein.

13. Defendant Community First Games ("CFG" or "Rifters") is a Panamanian Business Entity, founded by Defendant Andrew Ringlein. CFG developed and marketed the Rifters gaming project and associated Rifters: Exiles NFT collection. CFG operated as a sister company to Opera Event, sharing community infrastructure, investor base, and cross-promotional resources with the Communi3 platform. CFG directed, controlled, and profited from the unlawful conduct alleged herein as it relates to the Rifters digital assets.

### c. Individual Defendants

14. Defendant Brandon Byrne ("Byrne") is an individual who, upon information and belief, resides in the San Francisco Bay Area, California. Byrne is the co-founder and Chief Executive Officer of Opera Event. Byrne has held this position since approximately December 2015. Byrne was the primary public spokesperson for the Communi3 project, authored thought leadership articles on Medium and TechCrunch, and personally made or directed the material misrepresentations alleged herein. Byrne personally attended and promoted the Communi3 project at NFT NYC 2022 in New York City. Byrne personally directed, participated in, and profited from the unlawful conduct alleged herein.

15. Defendant Andrew Ringlein ("Ringlein") is an individual who, upon information and belief, resides in the United States. Ringlein is the co-founder of Opera Event and served as President, Head of Product, and Head of Sales from approximately March 2016

through January 2023. Ringlein subsequently founded Community First Games and served as its CEO from approximately March 2022 through November 2023. During the relevant period, Ringlein exercised operational and financial control over Opera Event's marketing, fundraising, and promotional activities, including the planning, funding, and execution of Opera Event's NFT NYC 2022 participation and the coordinated New York-directed solicitation campaign described herein. Ringlein made or directed numerous material misrepresentations regarding the Communi3 platform, the $SCI token, and the Rifters project. In a Discord exchange in June 2023, Ringlein admitted to structuring the Rifters entity through Panama to avoid legal liability, stating in substance that he was judgment-proof. Ringlein personally directed, participated in, and profited from the unlawful conduct alleged herein.

16. Defendant Erik Bryant ("Bryant") is an individual who, upon information and belief, resides in the United States. Bryant served as a member of the founding team and in a leadership capacity at Opera Event during the relevant period. Bryant participated in the marketing, promotion, and sale of the digital assets at issue and personally directed, participated in, and profited from the unlawful conduct alleged herein.

17. Defendant Eddie Tsaio ("Tsaio") is an individual who, upon information and belief, resides in the United States. Tsaio served as a member of the founding team and in a leadership capacity at Opera Event during the relevant period. Tsaio participated in the marketing, promotion, and sale of the digital assets at issue and personally directed, participated in, and profited from the unlawful conduct alleged herein.

18. Defendant Matt Espinoza ("Espinoza") is an individual who, upon information and belief, resides in the United States. Espinoza served as a member of the founding team

9

and in a leadership capacity at Opera Event during the relevant period. Espinoza participated in the marketing, promotion, and sale of the digital assets at issue and personally directed, participated in, and profited from the unlawful conduct alleged herein.

## III. JURISDICTION AND VENUE

### a. Subject Matter Jurisdiction

19. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which at least one member of the class of plaintiffs is a citizen of a State different from at least one defendant.

20. The aggregate amount in controversy exceeds $5,000,000. Defendants raised conservatively $6.5 million to $8 million or more in direct NFT mint proceeds alone, and the total damages suffered by the Class, including the diminution in value of digital assets, consequential damages, and restitution of profits, substantially exceed this threshold.

21. Minimal diversity exists under CAFA because Plaintiff is a citizen of California, and Defendant Opera Event is a citizen of Delaware and California. The individual Defendants are citizens of various states. The Class includes members who are citizens of states other than the states of citizenship of Defendants.

22. The proposed Class consists of more than 100 members, satisfying the numerosity requirement of 28 U.S.C. § 1332(d)(5)(B). The Communi3: Mad Scientists collection

alone comprised 5,001 NFTs sold to individual purchasers, and the Rifters: Exiles collection comprised over 7,000 additional NFTs sold to individual purchasers.

### b. Personal Jurisdiction

23. This Court has personal jurisdiction over all Defendants. Defendants purposefully directed their activities at the New York market and at participants in the NFT and Web3 industry whose principal annual gathering takes place in New York City. NFT NYC is the flagship NFT and Web3 conference in the United States, staged annually across multiple Times Square venues, attended by thousands of builders, creators, executives, investors, and operators, and sponsored by and participated in by leading Web3 companies, exchanges, marketplaces, and infrastructure providers. Within the NFT market, participation in NFT NYC serves a credentialing and validation function: it signals that a project is sufficiently established, visible, and connected to appear at the industry's principal gathering. Defendants deliberately exploited that signaling effect. Defendants' marketing materials, including Discord announcements, Twitter posts, and other digital communications, were directed at and accessible to New York consumers, and multiple Class members are New York residents who purchased digital assets in reliance on Defendants' representations, including in connection with and following Defendants' New York conduct. Defendants' New York conduct was not peripheral or incidental; it was a coordinated component of the integrated, market-wide solicitation campaign through which Defendants induced Plaintiff and the Class to purchase, hold, and refrain from selling the digital assets at issue. Plaintiff's and the Class's claims therefore arise out of and relate to Defendants' contacts with the State of New York.

**c. Venue**

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Defendants' solicitation activities at NFT NYC 2022, including their coordinated promotional communications they broadcast in connection with their New York appearance, took place in New York City, within this District. Those activities reinforced and amplified the same misrepresentations and omissions about the Communi3 platform, the $SCI token, and the digital assets that Defendants were disseminating through Discord, Twitter, Medium, and other public channels, and that induced Plaintiff and the Class to purchase, hold, and refrain from selling. Defendants' deceptive marketing was directed at and received by consumers in this District, and members of the Class who reside in this District suffered injury as a result.

25. Defendants' New York conduct was not discrete or isolated. It was one coordinated component of a single, integrated national solicitation campaign, conducted simultaneously through Discord, Twitter, Medium, public announcements, enterprise-client claims, investor-name-dropping, roadmap representations, and in-person participation in the industry's principal gathering, that was uniformly directed at retail purchasers across the United States, including purchasers in New York. The same misrepresentations and omissions that Defendants made and reinforced at NFT NYC are alleged throughout this Complaint and form the basis of the claims of Plaintiff and the Class. The claims of Plaintiff and the Class therefore arise out of, and in any event relate to, Defendants' New York conduct, because that conduct was part of the same continuous

course of solicitation through which Defendants induced the purchases, holding, and non-sale decisions at issue.

26. The exercise of personal jurisdiction over Defendants in this District is reasonable and comports with traditional notions of fair play and substantial justice. Defendants deliberately selected the premier NFT and Web3 industry gathering, held in New York City, as a stage for their solicitation activities; traveled to New York to attend and host events at that gathering; and derived reputational and economic benefit from their participation. Having purposefully used New York as a central forum for legitimizing the Communi3 project and marketing the digital assets at issue, Defendants should reasonably have anticipated being called to answer in this forum for claims arising out of and relating to that conduct.

## IV. FACTUAL ALLEGATIONS

### a. Opera Event and the Pivot to Web3

27. Opera Event, Inc. was founded in approximately 2015 by Defendants Brandon Byrne and Andrew Ringlein as an esports-focused technology company. The company initially developed community engagement and influencer management software for the traditional esports industry.

28. In April 2020, Opera Event closed a $5 million Series A funding round led by Antera, with participation from Atlas Ventures, Everblue, and Konvoy Ventures. At the time, the company described itself as an esports-focused influencer platform based in Oakland, California. According to public reporting, the company had generated $1.8 million in revenue in 2019 and was targeting $9 million in revenue for 2020.

13

29. In approximately 2021, Opera Event pivoted to the blockchain and Web3 space, rebranding its community engagement platform under the name "Communi3." The Communi3 platform was marketed as a B2B SaaS community management tool designed to help Web3 projects, gaming companies, and blockchain ecosystems manage, grow, and monetize their communities through gamified quest systems, analytics, and reward mechanisms. This pivot was the genesis of Defendants' fabricated innovation narrative: by wrapping a digital asset sales operation in the language and trappings of enterprise software, Defendants created the false impression of a technology company with genuine products and revenue, when in reality the primary business had become the sale of speculative digital assets to retail investors.

30. The pivot to Web3 was accompanied by a fundamental shift in Opera Event's revenue model. Rather than relying solely on enterprise software subscriptions, Defendants began creating and selling digital assets, specifically non-fungible tokens on the Solana blockchain, to retail investors. These digital asset sales became the primary mechanism through which Defendants extracted capital from the investing public. The enterprise software narrative served principally as a vehicle to justify inflated valuations for the digital assets and the never-launched $SCI token.

**b. The Digital Asset Offerings and the Inducement of Public Investment**

**i. Communi3: Laboratories**

31. In approximately April 2022, Defendants launched the Communi3: Laboratories NFT collection. The collection consisted of only 100 NFTs, priced at approximately 1,000 SOL each, equivalent to roughly $100,000 per NFT at the time of sale. The extreme price

14

point was justified by Defendants as reflecting the enterprise-grade value proposition of the underlying platform.

32. Defendants represented that each Laboratory NFT constituted a perpetual license for the Communi3 software platform, which normally cost $5,000 per month for enterprise clients. Holders were told they could use the platform instance themselves, rent it to a paying client for $5,000 or more per month in recurring revenue, or breed an additional Laboratory after a twelve-month staking period.

33. Defendants further represented that Laboratory holders would gain membership in the exclusive "LabDAO," providing access to top investors and strategic decision-making within the Communi3 ecosystem, guaranteed participation in the upcoming $SCI token offering, and priority access to all future platform developments.

34. To manufacture the appearance of institutional demand and establish a high valuation precedent, Defendants announced that "HGE," identified as a major cryptocurrency influencer, had purchased ten Laboratories for 10,000 SOL, making him the "largest single investor" in the project. Defendants also highlighted a purchase by "SoftMoney" of five Laboratories for approximately $500,000. These announcements served the purpose of borrowing credibility from the perceived sophistication of these buyers and creating artificial demand signals that induced retail investors to participate at these extraordinary price points.

### ii. Communi3: Mad Scientists

35. In May 2022, Defendants launched the Communi3: Mad Scientists NFT collection, consisting of 5,001 NFTs minted at a price of 2 SOL each on the Solana blockchain. At the time of mint, the total primary sale proceeds were approximately 10,002 SOL,

representing roughly $500,000 to $1,000,000 depending on contemporaneous SOL prices.

36. The Mad Scientists collection was the retail-facing cornerstone of Defendants' fundraising operation. From the very first announcement on March 8, 2022, Defendants represented that purchasing a Mad Scientist NFT would entitle the holder to claim a share of ten percent of the total supply of the upcoming $SCI token through an initial decentralized exchange offering later that year.

37. Defendants represented that Mad Scientist holders could stake their NFTs to earn "faction tokens" at a rate of 107 tokens per day for a duration of six months. These faction tokens would convert to $SCI tokens on a one-to-one basis upon the token's launch. Defendants provided specific economic projections: each fully staked Mad Scientist would generate approximately 19,620 faction tokens over the staking period, and at the projected $SCI token price of $0.25 to $0.50 per token, each NFT would generate between $4,800 and $9,600 in value. Defendants further stated that an upgraded Mad Scientist would generate $30 to $60 per day in token value.

38. These representations were central to the marketing of the Mad Scientists collection and were the primary inducement for purchases. Defendants stated explicitly in their Discord community that the core value of owning a Mad Scientist was to accrue faction tokens tradeable for $SCI, and that $SCI was "an investment" that would be "listed on a major" exchange.

### iii. The NFT NYC Promotional Campaign

39. In June 2022, approximately one month after the Mad Scientists mint, Defendants traveled to New York City to attend NFT NYC, the flagship annual NFT and Web3

16

conference in the United States. NFT NYC is publicly recognized as a principal gathering place for builders, brands, creators, executives, investors, and operators in the non-fungible-token and Web3 industry, with programming in 2022 staged across multiple Times Square venues, and has been described in the trade press as the multi-day flagship non-fungible-token conference. Within the NFT market, participation in NFT NYC serves a credentialing and validation function: it signals that a project is sufficiently established, visible, and connected to appear at the industry's principal gathering. Defendants used their participation in NFT NYC as a major promotional vehicle for the Communi3 project precisely because of that signaling effect.

40. On June 20, 2022, the official @communi3_io Twitter account published a promotional post stating that Communi3 was "ready for NFT NYC," teasing upcoming project developments and encouraging the community to watch for announcements. The post included a stylized "Tesla Times" newspaper graphic with the headline "Mad Scientists Invade NYC" and referenced an exclusive party and a partnership with "a top-tier $SOL giant of a bluechip." The post was broadcast to Defendants' nationwide audience, including existing holders, prospective purchasers, and New York residents, and was designed to leverage Defendants' NFT NYC presence to reinforce the perceived momentum, institutional interest, and legitimacy of the Communi3 project.

41. At NFT NYC, Defendants hosted an exclusive in-person event for existing and prospective investors. The event served multiple functions in the scheme. It created the impression of a thriving, well-funded project with sufficient resources and stature to participate in, and host events at, the industry's premier conference. It enabled Defendants to make direct, in-person representations to investors, existing and prospective, New

17

York-based and otherwise, about the project's trajectory and the forthcoming $SCI token. And it supplied Defendants with an authoritative industry-event backdrop against which to reiterate, in person and in subsequent online communications, the same representations and omissions regarding the $SCI token launch, the projected token valuations, the enterprise client base, and the claimed institutional investor interest that Defendants were simultaneously disseminating through Discord, Twitter, Medium, and other public channels.

42. The timing and setting of Defendants' NFT NYC activities were strategic. They occurred at the height of Defendants' promotional campaign, between the Mad Scientists mint in May 2022 and the anticipated $SCI token launch in Q3 2022. By staging promotional activity at the principal industry gathering in the United States, Defendants materially reinforced, legitimized, and amplified the same misrepresentations and omissions they were disseminating through every other channel. Defendants' NFT NYC participation was not a separate or tangential promotional stop; it was one coordinated component of a unified, market-wide solicitation campaign, carried out through Discord, Twitter, Medium, public announcements, enterprise-client claims, investor-name-dropping, roadmap statements, and in-person industry-event participation, through which Defendants induced purchasers, including purchasers outside New York, to purchase, hold, and refrain from selling the digital assets at issue. Plaintiff's purchasing decisions, and his decisions to continue holding rather than sell, were made in reliance on the total mix of Defendants' public conduct and representations, of which Defendants' NFT NYC participation was a significant and integrated component.

18

### iv. Adorable Assistants

43. In approximately October 2022, Defendants launched the Adorable Assistants NFT collection at a mint price of approximately 15 SOL each. Purchasing an Adorable Assistant required the holder to also lock a Mad Scientist NFT for two months, further reducing the circulating supply and artificially supporting prices.

44. Defendants marketed the Adorable Assistants as a way for existing holders to increase their $SCI token allocation at a discount relative to the planned token offering price. Each Adorable Assistant generated 53.5 faction tokens per day when paired with one Mad Scientist, or 107 tokens per day when paired with two Mad Scientists. Defendants represented that the Assistants came "fully loaded with 20,000 of fresh token," reinforcing the impression that holders were accumulating a valuable cryptocurrency asset.

### v. Rifters: Exiles

45. In October 2022, and in parallel with the Communi3 NFT offerings, Defendant Ringlein launched the Rifters: Exiles NFT collection through Community First Games. The collection consisted of 7,037 NFTs minted at 10 SOL each, raising approximately $2,450,000 in primary sale proceeds.

46. Defendants marketed Rifters as a sister project to Communi3, leveraging the existing community and cross-promotional infrastructure. The Rifters project promised a $1,000,000 prize pool for competitive gaming, multi-chain deployment to Ethereum and Polygon, in-game earning mechanisms, and integration with the $SCI token economy through a currency conversion system where 33 faction tokens equaled 1 Dark Sol Rune equaled 1 SOL in value.

19

47. The Rifters project suffered the same fate as Communi3. The multi-chain deployment never materialized. The gaming platform failed to achieve meaningful adoption. The prize pool, to the extent it was ever funded, was not distributed as promised. The faction token integration with Rifters further enmeshed investors in a self-referential ecosystem of promises that were never fulfilled.

### c. The Staking System, Market Manipulation, and Ponzi-Like Structure

48. Central to Defendants' scheme was a staking mechanism through which holders of Mad Scientist NFTs could lock their NFTs in exchange for the accumulation of "faction tokens." These faction tokens, which came in three varieties corresponding to three in-game factions (Wizards Scrolls, Tinkerers Gears, and Scientists Elixirs), were represented as converting to $SCI tokens on a one-to-one basis upon the token's launch.

49. Each staked Mad Scientist NFT generated 107 faction tokens per day. Over the initial six-month staking period, each NFT would generate approximately 19,620 faction tokens. Holders who upgraded their NFT's profile picture art, at a cost of 750 to 1,000 faction tokens, could extend the staking period by an additional month, generating approximately 22,830 total tokens.

50. The staking mechanism was not merely a reward system; it was an instrument of market manipulation and artificial volume control. By requiring holders to lock their NFTs for extended periods, the staking mechanism artificially reduced the circulating supply of Mad Scientists on secondary markets, creating the illusion of scarcity-driven value appreciation and price stability. This artificial constraint on supply is analogous to market manipulation techniques such as wash trading and coordinated trading activity, all designed to create false signals of demand, liquidity, and price support. The ongoing

20

accumulation of faction tokens created a sunk cost dynamic that further discouraged holders from selling, as liquidating their NFTs meant forfeiting accumulated tokens and the anticipated $SCI airdrop.

51. Defendants further enhanced this dynamic with the introduction of the Adorable Assistants collection, which effectively doubled token generation capacity for holders who invested additional capital. An Adorable Assistant paired with one Mad Scientist generated 53.5 additional faction tokens per day; paired with two Mad Scientists, it generated 107 tokens per day. Purchasing an Adorable Assistant also required locking a Mad Scientist NFT for two months, further reducing circulating supply. The net effect was to extract additional capital from investors while deepening their economic commitment to a token that would never launch.

52. The staking system also incorporated a "PFP upgrade" feature that required holders to burn faction tokens, creating what Defendants described as "deflationary pressure" on the token supply. Defendants represented that these burn mechanisms would cause the value of remaining tokens to increase over time. In reality, the tokens being burned were entries in an off-chain database maintained by Defendants that had no independent economic value. The deflationary narrative was a marketing device designed to create the impression of a sophisticated tokenomic system, when in fact no token existed and no value was being created or destroyed.

53. The overall structure operated as an inherently unsustainable Ponzi-like or pyramid-like model. Earlier purchasers' perceived returns depended on the continuous entry of new participants whose capital sustained the project. The Laboratories purchasers at $100,000 each were sustained by the Mad Scientists mint. The Mad Scientists holders were

sustained by the Adorable Assistants and Rifters sales. At each stage, Defendants extracted fees and proceeds while requiring ever-increasing inflows to maintain the facade of value. When those inflows inevitably slowed, the structure collapsed, and the retail investors who had been induced to participate bore the entire loss.

### d. The Fabricated Innovation Narrative: Enterprise Client Claims

54. Defendants held out the Communi3 platform as a legitimate and thriving B2B SaaS enterprise, leveraging this narrative to create confusion between a genuine technology company and what was in substance a digital asset sales operation. The platform provided community management tools including a gamified quest system, analytics dashboards, and reward mechanisms for Web3 projects. Defendants claimed that the platform served major clients including The Sandbox, Yield Guild Games, Big Time, Magic Eden, Immutable, and Guild of Guardians.

55. Defendants made specific and grandiose claims about the platform's performance. In May 2022, Defendants stated that total SaaS revenue had tripled in the preceding six weeks. They claimed that the platform's monthly recurring revenue would surpass that of multiple billion-dollar cryptocurrency companies. In November 2022, Defendants claimed 3 million or more platform users, 600,000 monthly active users, 680,000 engagements generated in a single month, 234,000 follows from real users, and 116,000 tweets and retweets generated through the platform. The company also boasted that it had been "1% of Solana NFTs by creator revenue."

56. These claims served as the foundation of Defendants' borrowed credibility strategy. By invoking the names of recognizable industry participants as clients, Defendants created the implicit endorsement of these established brands. A reasonable consumer

encountering the Communi3 project would conclude that if companies like The Sandbox and Magic Eden trusted the platform with their communities, the underlying technology and business must be legitimate. Defendants never disclosed whether these relationships were paid, ongoing, material, or merely trial or pilot arrangements that had been abandoned.

57. Defendants used these metrics to justify their token valuation projections. The logic presented to investors was straightforward: if Communi3 was a rapidly growing enterprise software company with a proven revenue model and blue-chip clients, then a token backed by that revenue had a credible path to the projected $250 million to $500 million fully diluted market capitalization. This was the fabricated innovation narrative in its most potent form: a veneer of technological legitimacy used to inflate perceived asset value and induce public investment.

58. However, upon information and belief, the reality of the Communi3 business was materially different from Defendants' representations. The project began to lose clients and revenue as the broader cryptocurrency market declined in 2022. The enterprise revenue that was supposed to underpin the $SCI token's value was either substantially overstated or proved insufficient to sustain operations. Defendants never disclosed the actual financial statements of Opera Event to investors, maintaining an information asymmetry that prevented any independent verification of revenue claims.

59. The team's size, which Defendants claimed exceeded forty people at its peak, contracted as the project's financial difficulties mounted. By early 2023, the project was no longer onboarding new enterprise clients, existing client relationships were lapsing, and the

23

engineering team that was supposedly developing the $SCI token infrastructure was, upon information and belief, being reduced or eliminated entirely.

### e. The Dubai Fundraising Trip, Borrowed Credibility, and Institutional Claims

60. In November 2022, Defendants announced with considerable fanfare that they were traveling to Dubai for meetings with potential private token investors. Defendants stated that they were targeting $20 million in private sales to fund the $SCI token offering. This announcement was designed to create the impression that the token launch was imminent and that major institutional capital was flowing into the project.

61. Defendants claimed to have secured meetings with Animoca Brands and Binance, two of the most recognizable names in the cryptocurrency industry. They described attending the World Blockchain Summit with 210 high-powered investors and 40 project owners, at which the Rifters project was purportedly voted the number one project after meetings with approximately 35 investors.

62. Defendants also invoked the names of other institutional investors and venture capital firms. They claimed that the company had raised "$9 million from VCs as the company grew and scaled over 5+ years in Web2" and that the company was valued at millions. They referenced specific meetings with token funds, connections with investors and claimed tremendous traction on fundraising to fuel the token drop and IDO.

63. These institutional investor claims were the clearest example of Defendants' borrowed credibility strategy. Defendants did not merely suggest that institutional interest existed; they named specific, well-known firms and described specific meetings, creating the strong impression that these sophisticated entities had conducted due diligence and validated the Communi3 investment thesis. A reasonable consumer encountering these

24

representations would conclude that if Animoca Brands and Binance were interested in funding the $SCI token, the project must be legitimate. In reality, upon information and belief, Defendants failed to secure the $20 million in private sales, no major institutional investment materialized, and the meetings with Animoca Brands and Binance did not result in any investment, partnership, or tangible support for the project.

**f. Undisclosed Insider Holdings, the Offshore Structure, and Consciousness of Wrongdoing**

64. Throughout the life of the project, Defendants and their insiders maintained significant undisclosed control over the supply, liquidity, and trading conditions of the digital assets. As the creators and issuers of the NFT collections, Defendants controlled the total supply, the mint timing, the royalty structure, and the staking parameters. Upon information and belief, Defendants and affiliated entities or individuals retained or accumulated positions in the digital assets that were never disclosed to investors. These insider holdings positioned Defendants to benefit from the artificially inflated prices their own representations created, while retail investors operated without knowledge of the insiders' positions.

65. In a Discord exchange dated June 2, 2023, Defendant Ringlein made statements that demonstrate his awareness of the wrongful nature of the conduct alleged herein. Ringlein stated in substance that any investors who sued would be unable to recover against him because the entity had been organized in Panama and he was effectively judgment-proof.

66. This statement is significant for several reasons. First, it demonstrates that Defendants were aware that investors might pursue legal claims based on the conduct alleged herein. Second, it reveals that Defendants took affirmative steps to structure their entities in a

25

manner designed to frustrate investor recovery. Third, it suggests that Defendants viewed the loss of investor capital not as an unfortunate consequence of market conditions but as a foreseeable outcome of their business model. A defendant who structures entities to avoid liability before harm has occurred has demonstrated consciousness of wrongdoing.

### g. Defendants' Material Misrepresentations and Omissions

#### i. False Statements Regarding the $SCI Token Launch

67. From March 2022 through at least mid-2023, Defendants made a series of specific, time-bound representations regarding the launch of the $SCI token that were false, misleading, or made without reasonable basis. These representations include, but are not limited to, the following:

68. In March 2022, contemporaneous with the announcement of the Mad Scientists NFT collection, Defendants stated that the $SCI token would launch through an initial decentralized exchange offering "later this year," meaning 2022.

69. In May and June 2022, as the Mad Scientists mint was underway and staking commenced, Defendants told the community that the token launch was coming "next month" and "soon," moving the timeline to Q3 2022.

70. In September 2022, Defendants stated that the IDO would "likely" occur in December 2022 or January 2023.

71. In October 2022, Defendants stated that market conditions were "favorable to launch $SCI MUCH SOONER" than previously indicated, creating the impression that the launch had been accelerated.

72. In November 2022, Defendants announced that they were traveling to Dubai for meetings with fifteen to thirty potential private token investors and were targeting $20 million in

26

private sales to fund the token offering. Defendants claimed to have secured meetings with Animoca Brands and Binance, two of the most prominent names in the cryptocurrency industry.

73. In January through March 2023, Defendants continued to represent that the token launch was planned for Q1 2023.

74. None of these representations materialized. The $SCI token was never launched, never listed on any exchange, and holders never received the promised allocations. Each successive promise served to maintain investor confidence and discourage secondary market sales while Defendants continued to collect proceeds.

75. The pattern of serially broken deadlines is itself evidence of fraud. Each new deadline created a window during which investors were incentivized to hold rather than sell. Investors who might have cut their losses after the Q3 2022 deadline passed were persuaded to hold by the December 2022 promise. Investors who might have sold after December were persuaded by the Q1 2023 promise. At each stage, Defendants provided just enough specificity to maintain credibility: meetings with named investors, reference to specific fundraising targets, comparisons to named comparable token offerings. The cumulative effect was a rolling deception that kept investors locked in while the value of their holdings steadily deteriorated.

### ii. False Statements Regarding Business Fundamentals

76. Defendants made numerous representations regarding the financial health, client base, and growth trajectory of the Communi3 platform that were false, misleading, or made without reasonable basis:

77. Revenue Claims: Defendants represented that Communi3 earned "from $5,000 to $100,000 a month per client," that "total SaaS revenue has tripled in the last 6 weeks," that the company's monthly recurring revenue "has surpassed multiple billion dollar crypto companies," and that the company's growth trajectory "would catch Salesforce at end of 2024." These statements created the impression of a thriving, rapidly growing enterprise software business.

78. Client Claims: Defendants repeatedly invoked the names of major Web3 companies, including The Sandbox, Yield Guild Games, Magic Eden, Big Time, Immutable, and Guild of Guardians, to establish credibility and create the impression of substantial institutional validation. Defendants claimed 3 million or more platform users and 600,000 monthly active users.

79. These representations were material because they formed the basis upon which investors assessed the viability of the $SCI token launch and the underlying value proposition of the NFTs. If the Communi3 platform was truly generating substantial recurring revenue from blue-chip clients, then the $SCI token, backed by that revenue, had a credible path to the projected valuations. Without these fundamentals, the token projections were baseless.

### iii. False Statements Regarding Token Valuations

80. Defendants provided specific and detailed token valuation projections that created concrete financial expectations for investors. Defendants cited comparable token offerings, including Partisia ($45 million IDO), Bastion ($30 million IDO), Stader Labs ($40 million IDO), and JPEG'd ($60 million IDO), and projected a $SCI fully diluted

market capitalization of $250 million to $500 million, with a per-token price of $0.25 to $0.50.

81. Based on these projections, Defendants told holders that each fully staked and upgraded Mad Scientist would generate $30 to $60 per day in token value. These were not caveated projections or aspirational targets. They were presented as credible financial expectations rooted in comparable market data. Investors relied on these representations in deciding whether to purchase, hold, or sell their NFTs.

### iv. Material Omissions

82. In addition to affirmative misrepresentations, Defendants omitted material information that a reasonable investor would have considered significant in deciding whether to purchase or hold the digital assets, including but not limited to:

83. The true financial condition of Opera Event, including whether the company was actually generating the revenue it claimed from enterprise clients and whether the revenue was sufficient to sustain operations, let alone fund a token launch.

84. That the $SCI token launch required substantial additional capital that Defendants had not secured, and that the private sale targets of $20 million were aspirational rather than funded.

85. That Defendant Ringlein was departing Opera Event to pursue a separate venture, Community First Games, and that the Rifters project was diverting management attention and resources from the core Communi3 platform.

86. That Defendant Ringlein had structured the Rifters entity through Panama specifically to avoid legal liability to investors, demonstrating Defendants' awareness of the fraudulent nature of their enterprise.

29

87. That Defendants and their insiders maintained undisclosed positions in the digital assets and exercised undisclosed control over supply and liquidity conditions, including through the staking parameters they unilaterally determined.

88. The team's size, operational capacity, and burn rate relative to its actual revenue, and whether the enterprise could sustain development long enough to deliver on its promises.

**h. The Liquidity Extraction and Collapse**

89. Beginning in approximately early 2023, the Communi3 project entered its terminal phase. Defendant Ringlein departed Opera Event. Discord activity, which had been the primary communication channel between Defendants and their investor community, slowed dramatically. Platform updates ceased. Client integrations went dormant. What followed was the inevitable culmination of the scheme: Defendants extracted the remaining value and abandoned the project, leaving retail investors holding worthless digital assets.

90. By approximately February 2023, the project had effectively ceased operations. No $SCI token was launched. No IDO was conducted. No exchange listing occurred. No token airdrop was distributed to NFT holders. The faction tokens that holders had accumulated through months of staking were revealed to be worthless points in a system that would never connect to a real cryptocurrency.

91. The digital assets that Defendants had sold at prices ranging from 2 SOL to 1,000 SOL became effectively worthless. The Mad Scientists collection floor price collapsed. The Laboratory NFTs, sold at approximately $100,000 each, became illiquid and valueless. The Adorable Assistants, designed to enhance token accumulation for a token that was never launched, served no purpose. The Rifters: Exiles collection suffered a similar fate as the gaming project failed to achieve viability.

92. Throughout this period of collapse, Defendants provided no meaningful communication to investors. There was no announcement that the $SCI token would not be launched. There was no disclosure that operations were winding down. There was no offer of refund, return, or remediation. Defendants simply stopped communicating and allowed the project to die while retaining the millions of dollars they had collected from investors. This pattern of enrichment followed by silent abandonment is the hallmark of a rug pull: a deliberate extraction of liquidity from an artificially created market, resulting in rapid value collapse once the insiders have monetized their positions.

### i. Harm to Investors

93. As a direct result of Defendants' misconduct, Plaintiff and Class members suffered substantial monetary damages. These damages include, but are not limited to:

94. Out-of-pocket losses: The amounts paid to purchase NFTs, including primary mint prices and secondary market purchases made in reliance on Defendants' continuing representations.

95. Loss of expected token value: The value of the $SCI token allocations that were promised to NFT holders but never delivered.

96. Opportunity cost: The loss of the ability to invest the funds deployed in Communi3 digital assets in other investments.

97. Consequential damages: Including but not limited to gas fees, transaction costs, and other expenses incurred in connection with purchasing, staking, and holding the digital assets.

98. The total damages suffered by the Class, which includes all purchasers of Communi3 and related digital assets, substantially exceed the CAFA amount-in-controversy threshold.

31

99. The harm to Plaintiff and Class members was not the result of ordinary market risk. The digital assets at issue did not decline in value because of general cryptocurrency market conditions. They became worthless because Defendants' representations, which were the sole basis for the assets' value proposition, were false. The $SCI token, which Defendants represented as the core value driver of the entire ecosystem, was never launched. Without the token, the NFTs had no utility, no revenue-sharing mechanism, no governance function, and no economic purpose. The digital assets became worthless not because the market declined, but because Defendants failed to deliver the product they had sold.

100.    The loss causation in this case is direct and traceable. Each significant price decline in the digital assets corresponded to a specific corrective event: the passing of a token launch deadline without delivery, the departure of key leadership, the reduction in platform activity, and the ultimate cessation of all communications. These were not exogenous market events; they were the predictable consequences of Defendants' failure to deliver on their promises and the inevitable result of a scheme that depended on continuous capital inflows to survive.

101.    Defendants' enrichment is equally direct and traceable. Defendants received SOL, USDC, and other cryptocurrency directly into wallets they controlled through primary NFT sales. They received additional revenue through secondary market royalties collected on each resale. They received platform fees. Upon information and belief, Defendants converted a substantial portion of these cryptocurrency proceeds to fiat currency or other assets. The total amount received by Defendants from all sources is believed to exceed $8 million, in amounts to be established through discovery.

## V. CLASS ALLEGATIONS

102. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

103. All persons and entities who purchased, acquired, or held Communi3: Laboratories, Communi3: Mad Scientists, Adorable Assistants, Rifters: Exiles, and/or related digital assets during the period from approximately March 2022 through the date of the filing of this Complaint (the "Class Period") and who suffered losses as a result of Defendants' conduct described herein (the "Class").

104. Excluded from the Class are: (a) Defendants and their officers, directors, agents, and employees; (b) members of the immediate families of any Defendant; (c) any entity in which any Defendant has a controlling interest; (d) persons who are bound by an enforceable arbitration agreement with Defendants covering the claims asserted herein and who do not opt out of such agreement; and (e) the legal representatives, heirs, successors, and assigns of any excluded person.

105. Plaintiff reserves the right to amend the Class definition based on information obtained in discovery.

### a. Numerosity (Rule 23(a)(1))

106. The Class is so numerous that joinder of all members is impracticable. The Communi3: Mad Scientists collection alone comprised 5,001 NFTs sold to individual purchasers. The Rifters: Exiles collection comprised over 7,000 NFTs. The Laboratories collection comprised 100 NFTs. The Adorable Assistants collection comprised additional NFTs. In total, thousands of individual purchasers acquired the digital assets at issue. The precise number of Class members can be ascertained through blockchain transaction data, which provides a verifiable, immutable ledger of all on-chain purchases and sales.

**b. Commonality (Rule 23(a)(2))**

107.   There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including but not limited to: (a) whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.; (b) whether Defendants engaged in false or misleading advertising in violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.; (c) whether Defendants' public representations were materially false or misleading; (d) whether Defendants made false promises regarding the $SCI token launch; (e) whether Defendants were unjustly enriched at the expense of Class members; (f) the proper measure of restitution and disgorgement; and (g) whether Plaintiff and the Class are entitled to injunctive or equitable relief.

**c. Typicality (Rule 23(a)(3))**

108.   Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members purchased the same digital assets, were exposed to the same misleading representations disseminated through the same public channels, were subject to the same broken promises regarding the $SCI token, and suffered the same types of injury, including the loss of funds invested in worthless digital assets. Plaintiff's claims arise from the same course of conduct that gives rise to the claims of the Class.

**d. Adequacy (Rule 23(a)(4))**

109.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are not antagonistic to or in conflict with the interests of the Class. Plaintiff has

34

retained counsel experienced in class action litigation and consumer fraud matters, who will vigorously prosecute this action on behalf of the Class.

### e. Predominance and Superiority (Rule 23(b)(3))

110. Common questions of law and fact predominate over any questions affecting only individual Class members. Defendants' representations were made uniformly to the entire market through public social media posts, Discord announcements, platform disclosures, and blockchain-recorded transactions. The digital asset offerings, token mechanics, and broken promises affected all holders identically.

111. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the large number of Class members makes individual joinder impracticable; (b) individual damages for many Class members may be relatively small, making individual prosecution economically infeasible; (c) this Court is an appropriate forum given Defendants' contacts with this District, including their promotional activities directed at New York consumers at NFT NYC 2022 in New York City; and (d) the claims involve common proof and can be managed efficiently as a class action.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(Against All Defendants, on Behalf of the Class)**

112.    Plaintiff, individually and on behalf of the Class, repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

113.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." The UCL imposes strict liability and does not require proof of intent to deceive. An action under the UCL must be commenced within four years after the cause of action accrued. Cal. Bus. & Prof. Code § 17208.

114.    Defendants engaged in business acts and practices within the meaning of the UCL. Defendants' marketing, promotion, and sale of the digital assets described herein were directed at the consuming public and constituted business acts or practices in California commerce. The NFT collections were publicly marketed through social media, Discord, and other channels. The digital assets were available for purchase by any member of the public with access to the Solana blockchain. The conduct at issue was not isolated to any single transaction but was part of a broad, uniform marketing campaign directed at the public at large, including California consumers.

115.    Defendants' conduct violated the "unlawful" prong of the UCL because it violated, among other things, California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq., and the California Consumer Legal Remedies Act principles prohibiting misrepresentations of material fact in connection with consumer transactions, as well as

36

California common-law duties against material misrepresentation and omission in the sale of consumer products.

116. Defendants' conduct violated the "unfair" prong of the UCL because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm caused by Defendants' conduct, the total loss of funds invested by thousands of retail purchasers in worthless digital assets, vastly outweighs any legitimate utility of the conduct. No reasonable consumer could have avoided the injury in light of Defendants' specific, quantified misrepresentations regarding token economics, enterprise revenue, institutional backing, and launch timelines.

117. Defendants' conduct violated the "fraudulent" prong of the UCL because it was likely to deceive members of the consuming public acting reasonably under the circumstances. Defendants made specific, quantified representations regarding the $SCI token launch timeline, projected token valuations of $250 million to $500 million fully diluted market capitalization, enterprise revenue, blue-chip client relationships, institutional investor interest, and the economic returns associated with the digital assets. These representations were materially misleading in that: (a) the $SCI token was never launched; (b) the projected valuations had no reasonable basis; (c) the enterprise revenue was overstated or nonexistent; (d) the institutional investor interest did not result in any actual investment; and (e) the digital assets provided none of the promised economic returns.

118. Defendants' representations were likely to mislead a reasonable consumer acting reasonably under the circumstances. The representations at issue were not vague puffery but specific, quantified claims of verifiable fact. A reasonable consumer exposed to promises of a token launch on a specific timeline, backed by named institutional investors

37

and enterprise revenue, would be misled into believing the digital assets had genuine value and utility.

119.   Plaintiff and the Class suffered actual injury in fact and lost money or property as a result of Defendants' unfair competition within the meaning of Cal. Bus. & Prof. Code § 17204. Plaintiff purchased digital assets in reliance on Defendants' representations and lost the value of his investment when the $SCI token was never launched and the digital assets became worthless.

120.   Plaintiff and the Class are entitled to restitution and disgorgement of all sums Defendants wrongfully received from Plaintiff and Class members through the unlawful, unfair, and fraudulent business practices described herein, pursuant to Cal. Bus. & Prof. Code § 17203. Plaintiff and the Class are further entitled to injunctive relief, including an order enjoining Defendants from further unlawful, unfair, or fraudulent practices, and an award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**SECOND CLAIM FOR RELIEF**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500 et seq.**
**(Against All Defendants, on Behalf of the Class)**

121.   Plaintiff, individually and on behalf of the Class, repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

122.   California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, prohibits any person or corporation from making or disseminating any statement in connection with the sale of goods or services that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

123. Defendants engaged in false advertising through their public promotion of the Communi3 project, the digital assets, and the $SCI token. Defendants disseminated untrue and misleading statements through Discord announcements, Twitter posts, Medium articles, public presentations, and other public channels accessible to and directed at California consumers. These false advertisements included specific representations regarding the $SCI token launch timeline, token valuations, enterprise revenue, client relationships, institutional investor interest, and the expected economic returns of the digital assets.

124. Defendants' advertising was untrue and misleading in a material way. The representations at issue were not general promotional language but specific claims of verifiable fact upon which a reasonable consumer would rely. The false statements regarding the $SCI token launch timeline, the projected $250 million to $500 million fully diluted market capitalization, the enterprise client base, and the institutional investor meetings were material to the purchasing decisions of Plaintiff and Class members and had a tendency to deceive a substantial segment of the consuming public.

125. Defendants knew, or by the exercise of reasonable care should have known, that the statements they disseminated were untrue or misleading. Plaintiff and the Class relied on Defendants' false advertising in making their purchasing decisions and suffered injury in fact and lost money or property as a result. The digital assets became worthless as a direct consequence of the falsity of Defendants' advertising.

126. Plaintiff and the Class are entitled to restitution, disgorgement, and injunctive relief pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17535, as well as an award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants, Pleaded in the Alternative)**

127.　Plaintiff, individually and on behalf of the Class, repeats and re-alleges each and every allegation set forth above as if fully set forth herein. This claim is pleaded in the alternative to the statutory claims above. To the extent Defendants contend that a valid and enforceable contract governs the parties' relationship, Plaintiff asserts this equitable claim in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

128.　Plaintiff and Class members conferred benefits upon Defendants by purchasing NFTs, paying primary mint prices and secondary market prices, and generating royalty revenue for Defendants through secondary market transactions. These benefits were conferred in reliance on Defendants' promises that the digital assets would provide the utilities, returns, and value described herein.

129.　Defendants enjoyed and accepted these benefits, knowing that they were conferred by Plaintiff and Class members, without objection or notice of any defect in the promised consideration.

130.　Defendants have wrongfully failed and refused to return or account for these benefits under circumstances that make it unjust for Defendants to retain them. Defendants received millions of dollars from Plaintiff and Class members and provided nothing of value in return. The digital assets are worthless. The promised token was never launched. The promised utilities were never implemented. Defendants' retention of these benefits violates the fundamental principles of equity, justice, and good conscience.

131.　The enrichment is traceable. Primary NFT sale proceeds flowed directly from purchaser wallets to Defendant-controlled wallets on the Solana blockchain. Secondary market royalties were collected through marketplace smart contracts and routed to

Defendant-controlled addresses. These transactions are recorded on a public, immutable ledger and are subject to forensic blockchain analysis. Plaintiff seeks restitution only of funds or assets actually retained by Defendants and traceable through on-chain records and Defendants' financial books and records.

132. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class members are entitled to restitution in an amount to be determined at trial.

**PRAYER FOR RELIEF**

133. WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that this Court enter judgment against Defendants, jointly and severally, and grant the following relief:

    a.   An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), designating Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel;

    b.   An order directing that reasonable notice be given to Class members pursuant to Fed. R. Civ. P. 23(c)(2)(B);

    c.   Restitution and disgorgement of all sums wrongfully obtained by Defendants from Plaintiff and Class members, including NFT primary sale proceeds, secondary market royalties, platform fees, and any other revenue actually received by Defendants through the unlawful conduct described herein, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17535;

d. Preliminary and permanent injunctive relief pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17535 enjoining Defendants from engaging in further unlawful, unfair, or fraudulent business practices and from further false or misleading advertising;

e. Restitution under the Third Claim for Relief for unjust enrichment, in the amount of all benefits wrongfully retained by Defendants at the expense of Plaintiff and the Class, to be proven at trial;

f. Imposition of a constructive trust over specifically identifiable digital assets, including cryptocurrency wallets controlled by Defendants and any remaining proceeds traceable to the conduct alleged herein;

g. A preliminary and permanent injunction restraining Defendants, to the extent permitted in equity, from transferring, dissipating, encumbering, or otherwise disposing of specifically identifiable, traceable assets derived from the conduct described herein;

h. An award of reasonable attorneys' fees and costs as permitted by law, including pursuant to Cal. Code Civ. Proc. § 1021.5 and Cal. Bus. & Prof. Code §§ 17203 and 17535;

i. An award of prejudgment and post-judgment interest at the applicable statutory rate; and

j. Such other and further relief as this Court deems just, proper, and equitable.

## JURY DEMAND

134. Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all issues so triable.

Dated: April 20, 2026
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**
/*s/ Max Burwick*
Max Burwick, Esq.
1 World Trade Center, 84th Floor
New York, NY 10007
Tel: (646) 762-1080
max@burwick.law

*Counsel for Plaintiff and*
*the Proposed Class*

43